Good morning. I am Michael Harwin, representative of Fernando Aburto. This was a man left to his own devices would have not been enmeshed in any criminal activity. He is a man who complained four times over a period of a year and a half. In fall of 2002, in the ER, government agent testified that Mr. Aburto came forward and complained about corruption in the exportation process. He followed up providing real time information later that fall. This is page 615 in the testimony of Agent Ruttencutter. And if he had been successful, I suppose it would have taken care of the problem that he was facing with his competitors. But if the government doesn't follow up on that, does that give him any leave to join the opposition and involve himself? You're not saying that the economics of it were such that if the government didn't take care of it, he gets to do the same thing and commit the same criminal acts? I am saying that. You are saying that? Yes, sir. So that if I understand correctly, if a person is robbing banks and a person says, you ought to get these folks, and the government doesn't get them, then he can go rob banks because he's in competition with them? I don't think, with all due respect, Mr. Wallace, I don't know that that's a fair analogy, and I'm going to tell you why. Perhaps it isn't, but let's stick with yours. Sure. These are business people who are exporting vehicles, and some of them are becoming involved with bribery, and he blows the whistle on them. The government doesn't do anything. And it's your position that he can then start bribing so he can maintain competition with those who are bribing? Well, I don't know that it's a fair statement of my position. That's not what happened in this case, Judge. Tell me how it's different, then. My statement of the position, and I think these are the facts, is that not only did he complain four times, and you put your finger on it. I am saying it's economic pressure. Judge Kaczynski in Pullman talks about entrapment, inducement being anything that changes the balance of risks and rewards. And what happened here, Judge Collins said it was incredible. He complains not twice, but four times. He complains the third time to Agent Torres, who's then put in the export office because he's charged himself with a crime. Wait, wait, wait. I'm trying to get a handle on this. Yes, sir. For example, under the Foreign Corrupt Practices Act, it's not a defense to say, well, everybody else in this country accepts bribes, and we want to do it, too. I mean, I'm really having trouble with this notion. While I complained, nobody did anything. And instead of either doing some sort of administrative action, doing some sort of action against or working with the government, I now get to do it, too. Isn't that sort of like the kid saying, mom, everybody else is doing it, so I want to do it? Well, the Foreign Corrupt Practices Act is a good analogy, I think. And we thought about that as we defended this case. This is a case of our own government officials, really, our own government officials accepting petty bribes. And it was rampant corruption at the office. But to say, I don't think that's quite fair, either. And Judge Collins had said, well, if everyone else is jumping off the bridge, should you, too? That's not quite the case here. He was not only reluctant, but the inducement happened in four different ways. Number one, as Judge Wallace points out, the government did nothing. They knew. Well, that's not affirmative inducement. Yes, actually, I was going to ask that question, too. Because it seems that our previous entrapment kinds of cases have dealt with actions rather than inaction. And it seems to me that you're taking an omission as entrapment rather than a commission of an act. Well, please let me respond to that. I know the government's pointed out that there's no case on point where, in part, and I'm only arguing in part, the government knowing that they've got corrupt agents at their export office and letting it go on can be inducement. I could find no case law saying it can't. The case law, Jacobson, Pullman, Hollingsworth out of the Seventh Circuit. I think maybe there's a reason they haven't said it can't, and you can't find any authority. Well, I don't know. Let me ask you this. Let me ask you this. How much inaction? What's the cutoff when it becomes inducement? When the government, complaints are made. Let's assume even more complaints have been made. Was it the first complaint, the second complaint, the third complaint, or is it just his perception that the government isn't doing anything that now warrants his decision to go ahead and engage in this activity? What is the standard you would have this court enunciate? I think the standard in Pullman, I think the standard in Pullman is the correct standard, and there's really five ways that he induced them, and doing nothing is only one of them. And please allow me to explain. So surely he complained four times, and they did nothing at least until September of 2003. But they also put Agent Torres side by side with Jesus Alvarez, and allowed Agent Torres to take bribes side by side. And this is, Judge Wallace has talked about, puts incredible economic pressure on the defendant. The government's own witnesses have said that he had to pay bribes because his business was being ruined. Now, maybe it's the case. But you haven't answered my question. Yes, sir. My question was a broader one than that. And my question is, since, as you say, there is no authority in this situation, you're saying that when the inactivity arises and forms a subjective perception in your client's mind, or a similarly situated person, that A, my business is being ruined, and B, everybody else is getting away with it, and the government isn't responding, and the government is knowingly permitting it. What is the standard for inactivity being, at what point, and is it purely a subjective standard that you're articulating, for the individual to say, okay, now I'm authorized to go ahead and commit bribes? I would have to answer the question by saying that I don't think that that is the heart of this case. And I don't think that there's a question I'd like answered. I believe it's a factor that can be considered. I don't see why. That's what I'm asking you. Yes, sir. What are the factors? Sure. Hold on. In a broad statement, if we were to write an opinion that says, here are the factors that justify, and is it only a subjective perception that you're arguing creates a right to go ahead and commit the crimes, but at what point here does inactivity in the face of some complaint by a person suddenly give that person license to commit the same crime? Okay. I respond by saying that there's five factors in this case were you to write the opinion. And knowing about it and doing nothing is one factor, whether it's subjective or objective. But I think the record shows that, objectively, nothing was done. Number two is putting the other agent side by side, because he's the guy who was complained to a number of times. Because the export office is small, it creates the perception, as you said, to these brokers that the whole office is corrupt. And why is that important? These brokers make their entire livelihood. They're dependent on that export office for their whole livelihood. This is what they do. They export vehicles. Number three, in this case, they used a sympathetic ruse, if you recall. The arrested agent who loses his gun and is put in the export office, Torres, is told to tell the brokers in the community that he needs the money to pay his lawyer. Now, Fernando Alberto has a relationship with him. He complained to him. He sought him out twice. March of 2003, told him about the bribery. And then in August, he delivered a letter to him. So he has a relationship with him. And Pullman and the other case law says that sympathy, Sherman talks about sympathy, as being a factor. Four, in this particular case, the agent Torres sought out Mr. Alberto at his own office after being told not to. Van Nimwegen, one of the agents, testified that he told Fernando, I mean, he told the undercover agent Torres to not go to brokers' offices. But he did so anyways, in this case, to solicit the bribe. And he stated on a tape while he's going there, I'm going to get Fernando too. He'll pay Fernando. He's putting pressure on him. He's exacting pressure, economic pressure. To induce the bribe. Number five, and you may object to this, Judge Wallace, but they didn't tell him about the investigation. He complains four times. He's a man who complains four times, incredibly reluctant. I think if there's one thing we know here, it was four times. Okay. Yeah, we got it. Well, I'm sorry if I'm repeating it too much. But to me, it's incredible how many times he complained over a period of a year and a half and nothing was done. Now, what happens, he writes the letter and he hears nothing until December when Agent Van Nimwegen manneth come into his office and threaten him. Then they ask him to go and bribe Carlos Felix, another corrupt agent, who's the target of the investigation. And he tells them that he thinks they're crazy because everybody knows he's the broker in town who's complaining about corruption. Counsel, you have exceeded your time. So we'll hear now from the government and we'll give you a little bit of rebuttal. Very good. I thank you very much. May it please the Court, my name is Cynthia Wood. I'm the Assistant United States Attorney assigned to the case. Good morning. Good morning. With regard to the entrapment, the defendant bears a very heavy burden. In order to be entitled to acquittal as a matter of law, he has to present or he has to point to undisputed evidence making it patently clear that an otherwise innocent person was induced. Well, he started out as an innocent person. In fact, an outraged person, didn't he? That is correct. Well, it depends. The defendant in this case made a number of self-serving statements about his ---- All testimony is self-serving. That's why it's offered. It doesn't really get you very far. It is an unusual case, isn't it, in the extent of initial resistance to criminal activity? There was no. The government believes that there was no initial resistance to the criminal activity. It's a great deal. It makes a point that he complained four times. There were, in fact, two investigations initiated as a result of the defendant's complaints. There was one in June. Let me ask you this. You have the four complaints, which certainly indicates that at that point he's trying to get this situation solved so he can compete fairly with his competitors. Is it the government's position that there can never be such a lack of action or such a level of corruption that is well known within a particular agency and it's well known and is there ever a situation where inactivity or inaction in the face of complaints to remedy that, knowing that other honest competitors can't compete, that could constitute, and I know you say it doesn't here, that could constitute sufficient inducement to at least allow the entrapment defense to be raised? The government never says never. There may very well be a situation where that exists. But the courts know it when you see it, but this isn't it, right? This isn't it. This is the fact of the matter is that 15,850 vehicles moved through the port of entry during the period of this investigation. Business was booming. The bribes affected less than approximately 2 percent, 359. We accepted 359 bribes in connection with 359 vehicles. People, there were 70 other people in the export business that in fact had responded to a questionnaire by the government about whether or not they were doing business there. They were told they needed ID cards. Seventy people responded, brokers, people who regularly did business with the export office. We had 18 brokers that were charged in connection with this case. The defendant showed no reluctance whatsoever. The inspector who in fact went undercover in this case, the investigation began, the actual investigation into the bribery in this case began in September of 2003. The inspector who was involved was shocked when a runner approached him and said, look, I'm going to pay you $1,000 on behalf of the defendant and his business partner who was also charged in connection with this case. That was September 10th. The defendant was among the first people to pay bribes in connection with this case. He was among the most prolific. He paid 100 out of 359. And he stopped in December of 2003 when the agents approached him. They said, look, hey, you've now, you've been complaining about these bribes. We now have you on tape paying them. We have your cohorts, your business partner paying bribes. We have the runner who works for you. He's been bringing us money on your behalf. You indicated that there was another agent involved in this matter who was also accepting bribes. Will you work with us? And at that point the defendant refused and there were no further payments. There were one or two payments later on, much later in February by a runner, which we're not certain was in fact associated with the defendant's business. But the defendant essentially stopped paying bribes in connection with this case. There was the government's position is that when you argue that the government created the inducement in connection with this case, inducement has been found in connection with specific investigations. And there is nothing in connection with this specific investigation that induced the defendant. There's no information that the defendant points to the sympathetic ruse. There's no information that the defendant even knew. Inspector Torres certainly hadn't told him, hadn't had an opportunity to speak with him, hadn't had an opportunity to tell him he needed money. There's no information, the defendant didn't testify that he spoke with Inspector Torres before that or even that he knew that Inspector Torres needed money at that point. There's no information regarding the defendant's loss of market share. I understand there's his testimony, but there's no auditor, there's no accountant, there's no nothing showing that his market share has actually in fact decreased. In fact, as part of the appendix in this case, we collected this information. We also collected how long people had in fact been in business or had been involved in the export brokerage business. Out of the 70 people that responded, 53 of them had only been involved, 53 of those individuals weren't involved in accepting bribes at all. And of those individuals, 30 of them had been involved in the business for less than two years. It's entirely possible, you've got to remember that this isn't a business that required any special skill, no special talent, all they were doing was collecting titles, waiting the three days and then giving people their paperwork back. We found that a lot of people had in fact either there was a high rate of turnover in the business or there were a lot of people who had joined the business. It was a good thing, they were charging for a service that was essentially free. There were no fees associated with this. There was no, you know, it didn't require any particular talent. Based on all of that, there is no evidence that there was that the government, again, and he speaks loosely about the government and makes no distinguishment between any of the agencies that he spoke with. One has to remember also kind of as a subcontext what's going on. It was March of 2003 when the Department of Homeland Security was created. That means that agencies are switching. It means that the people from Customs who had been legacy Customs, who quite frankly had never, whose contact with the Department of Justice agencies had in fact been somewhat limited, they're now all lumped together at the port of entry. Inspectors who were legacy Customs now become part of Customs and Border Protection. There is some disarray among the agencies as to who's doing what. But they are in fact his complaints. As I indicated, there were in fact two investigations within 14 months initiated as a result of his complaints. In fact, there were other individuals charged. The agents testified. Agent Diaz testified. Agent Ruttencutter testified. The defendant in fact, they had in fact initiated an investigation. There were individuals indicted in connection with that. Not quite certain what else we were supposed to do. The defendant says, well, look, you didn't tell us about the undercover investigation. It's an undercover investigation. You know, we're not required, nor should we be required to provide information about an undercover investigation to people who complain about it. And as to the fact of the matter is, he has a very difficult burden. He has to show, unfortunately, it's a fact of life that contributes to the fact that conducting businesses legitimately does in fact is more expensive than doing it if you cheat. Cheaters unfortunately sometimes do prosper. They prosper in the short run, hopefully not in the long run. And I believe this investigation is a result of that. Do you want me to address the Brady claims at all? It's totally up to you. The only question I'd add to Brady is your position is, I understand it, that there is no prejudice shown at all for the four remaining areas. That would be correct. There's no evidence that the government even suppressed anything. We have no new, we have, there was no Brady challenge below, and there's no, in fact, it's kind of a thinly disguised, it's government's position, it was a thinly disguised dissatisfaction with the district court's ruling. This was a bench trial. The district court ruled on the disclosure issues. We provided what they told us to provide. Provided some things they didn't tell us to provide. It's unfortunate that the defendant is not satisfied with those things, but there's no new evidence that's come forward that's indicated that the government was involved in any suppression. And certainly not of anything that would have exonerated. And certainly not of anything, not of anything. He's made no presentation that there's any evidence out there. So we're not certain at all. That's all that he's talking about. Thank you, counsel. Mr. Harwin, we'll give you one minute for rebuttal. Thank you. There are three areas I want to address in rebuttal. First of all, the government says that the defendant has a heavy burden. I think the burden is established in Pullman and the other case law that once we present some credible evidence of entrapment, the burden's on the government to prove beyond a reasonable doubt either that the defendant was induced or predisposed. I think that's the correct standard. Number two, the government believes that there was no initial resistance. And to me, and I'm sorry, Judge Asciovelli, for repeating four times so many times, but it seems that there was incredible resistance on the part of Mr. Roberto. Three, the government just got up and said, well, there's no real evidence that there was loss of market share. But in the ER on page 245, the government's own witness said that the defendant, Mr. Roberto's business was being ruined. And on page 613 of the ER, Agent Ruttencutter testified that a year and a half earlier the defendant was complaining that he was being hurt by his competitors. As to the Brady, there are two issues in Brady. One is the other investigations, prior investigations of the Mariposa Port of Entry and the government just stated that there's no evidence that there was any, but we know there was, that would have helped show the level of inducement that we're here talking about today. The other was the Brady material for Carlos Felix, the target of the whole investigation, a corrupt customs official. We asked for that Brady material as impeachment and we didn't get it. And once again, we know that exists. Any other questions? I don't believe so. Thank you, counsel. The case just argued is submitted and we appreciate the participation of both counsel.
judges: Wallace, Graber, Schiavelli